# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARK D. JENSEN,

                Plaintiff,

      v.                                        Case No. 11-C-0803

JAMES R. SCHWOCHERT,

                Defendant.

---

## DECISION AND ORDER GRANTING PETITION

---

On February 21, 2008, following a six-week trial, a jury found Mark D. Jensen guilty of first-degree intentional homicide in the December 3, 1998 death of his wife Julie. Jensen's conviction was affirmed by the Wisconsin Court of Appeals, and the Wisconsin Supreme Court denied his petition for review. On August 24, 2011, Jensen, who is currently serving a life sentence at Dodge Correctional Institution, filed a petition seeking federal relief from his state conviction pursuant to 28 U.S.C. § 2254. Jensen claims that evidence of a series of accusations against him made by his wife before her death was admitted at trial in violation of his Sixth Amendment right to confront the witnesses against him and that the erroneous admission of this evidence had a substantial effect in determining the jury's verdict. He also argues that his due process right to be tried by an impartial judge was violated because the judge who presided over his trial had already found that he was guilty of the very crime for which he was on trial. After a number of extensions due to the size of the record, the case has been fully briefed and is now ready for disposition. For the reasons that follow, Jensen's petition will be granted.

## BACKGROUND

This case largely concerns the admission at trial of Julie Jensen's "voice from the grave" in the form of a letter and reports to police expressing her fears that her husband was plotting to kill her. On December 3, 1998, two weeks after penning the letter to police, Julie Jensen was found dead in the Jensens' Kenosha County home. The Jensens had been married for 14 years and had two young sons, David and Douglas, at the time. The first autopsy report did not identify a cause of death, and the case was initially treated as a suicide. Although there was conflicting medical evidence and the State later argued that Jensen also suffocated Julie, it was undisputed that she was poisoned by ethylene glycol, a substance commonly found in antifreeze.

The fundamental question at trial was whether Julie deliberately consumed the ethylene glycol herself or whether her husband had poisoned her. In other words, "[t]his case was not a classic whodunit": the question for the jury was whether Jensen killed his wife as the prosecution argued, or, as the defense contended, she committed suicide and framed her husband. *State v. Jensen*, 2011 WI App 3, ¶ 36, 331 Wis. 2d 440, 794 N.W.2d 482 (*Jensen II*). The State argued as much in its closing argument at Jensen's trial: "That's the real issue. Did Mark Jensen poison and then asphyxiate his wife or did Julie Jensen commit suicide, and in the process of planning her suicide also choose to frame her husband for murder." (Jury Tr., Feb. 18, 2008, Ex. 38A at 77, ECF No. 31-5.) Of course, since the burden of proof lies with the prosecution, the real question was whether the State had proven Jensen's guilt by evidence that was convincing beyond a reasonable doubt.

Prior to trial, both parties apparently believed that the jury's answer to this question would hinge on the contents of a sealed envelope Julie Jensen gave to her neighbors, Tadeusz and Margaret

2

Wojt, two weeks before her death. Julie told the Wojts that if anything happened her, they should give the envelope to the police. On the day after her death, as instructed, the Wojts gave the envelope to Detective Paul Ratzburg. It contained a handwritten letter signed by Julie Jensen and addressed to "Pleasant Prairie Police Department, Ron Kosman or Detective Ratzburg." The letter read as follows:

> I took this picture [and] am writing this on Saturday 11-21-98 at 7AM. This "list" was in my husband's business daily planner–not meant for me to see, I don't know what it means, but if anything happens to me, he would be my first suspect. Our relationship has deteriorated to the polite superficial. I know he's never forgiven me for the brief affair I had with that creep seven years ago. Mark lives for work [and] the kids; he's an avid surfer of the Internet...

> Anyway–I do not smoke or drink. My mother was an alcoholic, so I limit my drinking to one or two a week. Mark wants me to drink more–with him in the evenings. I don't. I would never take my life because of my kids–they are everything to me! I regularly take Tylenol [and] multi-vitamins; occasionally take OTC stuff for colds, Zantac, or Immodium; have one prescription for migraine tablets, which Mark use[s] more than I.

> I pray I'm wrong [and] nothing happens... but I am suspicious of Mark's suspicious behaviors [and] fear for my early demise. However, I will not leave David [and] Douglas. My life's greatest love, accomplishment and wish: "My 3 D's"—Daddy (Mark), David, [and] Douglas.

*Jensen II*, 2011 WI App at ¶ 7.

In the weeks before her death, Julie Jensen had made other statements to police accusing her husband of suspicious conduct. Officer Kosman received two voicemails from Julie in which she stated she thought her husband was trying to kill her. After returning her calls and upon Julie's request, Officer Kosman visited the Jensen home to speak with her. Julie told Kosman that she had given a letter to the Wojts, along with a roll of film that included photographs she had taken of part of Jensen's day planner that contained the list apparently referred to in her letter. She retrieved the

3

film, but not the letter, from the envelope she had given the Wojts and gave it to Officer Kosman. (Jury Tr., Jan. 24, 2008, Ex. 22B at 12–13, ECF No. 28-4.) She told him she had seen strange writings in the planner and saw Jensen looking at material on the internet that concerned her. When later developed, however, the photographs were of pages from Jensen's day planner with writing that police were unable to connect to the case. (Jury Tr., Jan. 24, 2008, Ex 22A at 75–87, ECF No. 28-3.) In any event, Julie told Officer Kosman that if she were found dead, that she did not commit suicide, and that Jensen was her first suspect. In addition to the letter and statements to police, Julie made statements that she feared her husband was planning to kill her to several other people, including the Wojts and her son's teacher, Therese DeFazio.

A later search of the Jensens' computer revealed internet searches for, among other things, suicide and poisoning, including a search on the morning of Julie's death for "ethylene glycol poisoning." The search also uncovered voluminous emails between Jensen and Kelly LaBonte, which revealed they were engaged in an extramarital affair. Kosman also testified that earlier in the summer of 1998, Julie Jensen had told him that it had become very "cold" in their home and that Jensen was not as affectionate as he used to be. He recalled Julie also telling him that when Jensen came home from work, he would immediately go to the computer. Kosman also noted that he had contact with Julie Jensen on numerous previous occasions over the course of several years beginning in the mid-1990s in response to her complaint that someone had been leaving pornographic photographs around the home and had making harassing phone calls. (Jury. Tr., Jan. 24, 2008, Ex. 22A at 42–43, ECF No. 28-3.) Kosman suspected that Jensen was responsible based in part on Julie's statements to that effect, which the State introduced as evidence of Jensen's anger over Julie's infidelity.

4

A criminal complaint was filed on March 19, 2002, charging Jensen with first-degree intentional homicide. From the start, Jensen challenged the admissibility of the letter and Julie Jensen's statements to Officer Kosman. He also challenged statements Julie made to the Wojts, Dr. Borman, and Ms. DeFazio. Jensen filed several pretrial motions to suppress Julie's statements on hearsay and confrontation grounds, which were extensively briefed and argued before the trial court. Although the statements were almost all deemed admissible at first, the trial court reconsidered its rulings in light of the United States Supreme Court's intervening decision in *Crawford v. Washington*, 541 U.S. 36 (2004). On reconsideration, the trial court ruled that the letter and Julie's accusations made to Officer Kosman were testimonial statements and, therefore, they were inadmissible because the declarant was unavailable to testify at trial and Jensen did not have a previous opportunity for cross-examination. (Cir. Ct. Order 4, Aug. 4, 2004, ECF No. 45-17.) The trial court also ruled that her statements to the Wojts and Ms. Defazio were not testimonial. (*Id.* at 2.) The court reasoned that these later statements did not fall within the definition of testimonial statements adopted in *Crawford* because they were not made to the police and the court was unable to conclude that they had been made under circumstances indicating an intent that they would be available for use at a later trial. (*Id.* at 2.) The court rejected, however, the State's argument that because the evidence supported a finding that Jensen had procured Julie's unavailability by killing her, all of the statements were admissible under the doctrine of forfeiture by wrongdoing. The court explained:

> [i]f an accused forfeits or waives the right of cross-examination merely by killing the victim to "put her out of the way," then there would have been no reason for the development of the Dying Declaration Rule, which . . . makes sense only in an evidentiary framework in which the mere fact that the defendant can be convincingly

5

shown to the judge to have killed the declarant does not, by itself, justify exception to the requirements of the Confrontation Clause.

(*Id.* at 5–6.)

The State filed an interlocutory appeal and petition to bypass to the Wisconsin Supreme Court. The Wisconsin Supreme Court granted the bypass petition and affirmed in part and reversed in part the trial court's decision. *State v. Jensen*, 2007 WI 26, ¶ 2, 299 Wis. 2d 267, 727 N.W.2d 518 (*Jensen I*). The court affirmed the trial court's holding that Julie's statements to the Wojts and DeFazio were nontestimonial. *Id.* at ¶¶ 20, 31–33. It also affirmed the court's conclusion that Julie's letter and statements to police were testimonial. *Id.* at ¶¶ 26–30. However, the Wisconsin Supreme Court held that the trial court erred in its analysis of the forfeiture doctrine. Instead of viewing the forfeiture doctrine as a narrow exception to an accused's right to confront the witnesses against him as the trial court had held, the Wisconsin Supreme Court explicitly adopted a broad interpretation of the forfeiture by wrongdoing doctrine "whereby a defendant is deemed to have lost the right to object on confrontation grounds to the admissibility of out-of-court statements of a declarant whose unavailability the defendant has caused." *Id.* at ¶ 2. It concluded that where "the State can prove by a preponderance of the evidence that the accused caused the absence of the witness, the forfeiture by wrongdoing doctrine will apply to the confrontation rights of the defendant." *Id.* at ¶ 57. The court rejected Jensen's argument that forfeiture only applies if the witness' absence was procured for the particular purpose of preventing the witness from testifying. On remand, the trial court was directed to hold a forfeiture hearing to determine whether a preponderance of the evidence supported a finding that Jensen killed his wife and thereby caused her absence from trial. *Id.* at ¶ 58. After a ten-day evidentiary hearing, the trial court found Jensen

6

had forfeited his right, and accordingly, held that all of Julie Jensen's statements—testimonial or otherwise—would be admissible.

On January 3, 2008, almost six years after the criminal complaint was filed, and more than nine years after Julie's death, Jensen's jury trial commenced. The resulting six-week trial produced a voluminous record, which will only be summarized as relevant here. The prosecution's case rested heavily on Julie Jensen's actions and statements in the months leading up to her death. The State presented evidence that it contended showed that Jensen was having an affair with Kelly LaBonte, that he was bitter about Julie's own previous affair, that Jensen had made elaborate plans to murder his wife in order to plan a future with Kelly, that he wanted to avoid a messy divorce and keep custody of the children, and that for months he had searched the internet for ways to carry out his plan to make Julie's death look like a suicide. The State also offered the testimony of two of Jensen's co-workers who claimed Jensen had made suspicious and incriminating statements to them. The State argued Julie Jensen's state of mind and behavior were inconsistent with someone who would commit suicide: she was a devoted mother and housewife who was worried about her husband's suspicious behavior but was optimistic that their family would stay intact. The State repeatedly argued that any suicide theory was directly contradicted by Julie's letter and conversations with police and other acquaintances. The State also argued that the medical evidence was inconsistent with suicide. Instead, it suggested that Julie Jensen could not have ingested the ethylene glycol by herself, and that Jensen had also suffocated her after she showed signs of recovering from the poison he administered.

The defense presented a markedly different story. The defense argued that Julie Jensen had the motive and opportunity to commit suicide, to frame her husband for her attempted murder, or

both. The defense established that Julie was suffering from depression and possibly other mental illness, and presented evidence of her resulting fear, irrational behavior, and delusional thinking in the weeks leading up to her death. Dr. Richard Borman, the Jensens' family physician, testified that during an appointment on December 1—two days before she died—Julie "seemed depressed and distraught and almost frantic, actually." (Jury Tr., Feb. 11. 2008, Ex. 33A at 35, ECF No. 30-5.) The defense also was allowed to offer evidence that Julie had a troubled family history, including allegations that she was abused, that her brother attempted suicide by slashing his wrists, that her mother struggled with alcoholism and depression before a drowning death that was rumored to be a possible suicide or homicide, and that another brother passed away in childhood under tragic and suspicious circumstances.

The defense also contested the medical and forensic computer evidence, attacked the credibility of the State's witnesses, and contended that much of the evidence was consistent with suicide. The defense described the medical evidence as questionable and inconclusive, attacking the credibility of the State's experts and presenting experts who concluded the evidence supported suicide. For example, the defense pointed to Julie Jensen's contradictory actions before her death, including her refusals of help from the Wojts and the police. The defense also highlighted the fifteen-minute telephone conversation Julie had with Mrs. Wojt on December 2, 1998, the day before Julie died, in which Julie told Mrs. Wojt not to worry if she did not see Julie outside that day because Julie was not feeling well due to her medication. (Jury Tr., Jan. 18, 2008, Ex. 19A at 15–16, ECF No. 27-7.) Julie made a similar statement to her sister-in-law on November 30, 1998, that she would be ill on Wednesday, December 2, 1998, because she expected to be put on medication by her doctor. (Jury Tr., Feb. 11, 2008, Ex. 33A at 137–38, ECF No. 30-5; Jury Tr., Feb. 11, 2008, Ex. 33B at 1–2, ECF No. 30-6.) And despite telling numerous people that she feared

8

her husband was trying to poison her, she did nothing when she actually started to get sick two days before her death and could have left the home or called someone for help.

The jury deliberated for more than thirty hours before finding Jensen guilty of first-degree intentional homicide. Jensen appealed his conviction, and raised, among other things, the same claims at issue here. Meanwhile, four months after Jensen's trial, the United States Supreme Court decided *Giles v. California*, in which it rejected the broad interpretation of the forfeiture doctrine that the Wisconsin Supreme Court had adopted in its decision reversing the trial court's order excluding Julie's letter and statements to police. The Supreme Court held in *Giles* that a defendant forfeits his right to confrontation only when he procured the absence of the witness for the particular purpose of preventing his or her testimony. 554 U.S. 353, 376–77 (2008). In other words, it was not enough that the defendant's conduct had the effect of making the witness unavailable to testify; for the statement to be admissible, the defendant's conduct must have been motivated by the specific intent to prevent the witness from testifying. *Id.* at 361–62.

Notwithstanding this substantial change in the law, the Wisconsin Court of Appeals affirmed Jensen's conviction on December 29, 2010. As relevant here, the court considered (1) whether "*Giles*' narrow interpretation of the forfeiture by wrongdoing exception to the Confrontation Clause overrule[d] the Wisconsin Supreme Court's broad interpretation in *Jensen* [*I*, 2007 WI 26] making Julie's letter and statements to Kosman inadmissible pursuant to *Crawford*"; (2) if so, whether the admission of the statements was harmless error; and (3) whether the circuit court was biased. *Jensen II*, 2011 WI App 3 at ¶ 20.

The court of appeals began its opinion by discussing *Giles* and its application to Jensen's case. Before the court of appeals, the State argued that even under *Giles*, Julie Jensen's testimonial

9

statements would be admissible because a preponderance of the evidence supported its theory that one reason Jensen killed his wife was to prevent her testimony in a divorce proceeding, and therefore, he forfeited his right to confrontation in her murder trial. The Wisconsin Court of Appeals decided, however, that it would "leave for another day whether *Giles* should be read to permit testimonial evidence when the state can establish by a preponderance of the evidence that the defendant sought to prevent the victim from testifying in *any* court proceeding." *Id.* at ¶ 34. Instead, it "assume[d] that the disputed testimonial evidence was erroneously admitted" and found the error was harmless beyond a reasonable doubt "given the voluminous corroborating evidence, the duplicative untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case." *Id.* at ¶ 35.

The court of appeals also rejected Jensen's judicial bias claim. Jensen had argued that his due process right to a fair trial was violated because the trial judge's pretrial forfeiture by wrongdoing ruling amounted to a prejudgment of guilt and rendered him biased when he subsequently presided over Jensen's trial. The court determined Jensen had waived the argument because he failed to present it in the trial court, but went on to state that "[f]urther, even if this argument had not been waived, it lacks merit." *Id.* at ¶ 95. Following the court of appeals' decision, Jensen filed a petition for review in the Wisconsin Supreme Court. The petition was denied on June 15, 2011 and Jensen timely filed his habeas petition two months later.

## ANALYSIS

### Sixth Amendment Confrontation Clause Violation

Jensen contends that the admission at trial of Julie Jensen's letter and statements to police violated his Sixth Amendment right to confrontation. The Confrontation Clause of the Sixth

10

Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Supreme Court has interpreted this right to bar the admission of testimonial hearsay evidence against the accused unless the declarant is both unavailable at trial and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. However, nontestimonial out-of-court statements are "exempted . . . from Confrontation Clause scrutiny altogether." *Id.* Although the definition of testimonial remains unsettled, particularly as it relates to statements made to private parties, Jensen does not challenge the Wisconsin Supreme Court's determination that Julie's statements to non-police witnesses, i.e., the Wojts and DeFazio, were nontestimonial and therefore not subject to Confrontation Clause analysis. Instead, Jensen focuses on Julie's letter to law enforcement and her statements to Officer Kosman as violations of his constitutional rights. The parties do not dispute that both the letter and Julie Jensen's statements to Officer Kosman were testimonial and that Jensen did not have a prior opportunity to cross-examine her. Respondent nevertheless argues that admission of Julie's letter and statements to Officer Kosman did not violate Jensen's confrontation rights, again advancing the forfeiture argument. Respondent also contends that the Wisconsin Court of Appeals' determination that any error was harmless constitutes a reasonable application of federal law.

### 1.     Constitutional Violation

Testimonial hearsay statements otherwise barred under *Crawford* may be admissible at trial under the forfeiture by wrongdoing exception to the Confrontation Clause. *Giles*, 554 U.S. at 359. Under that doctrine, a defendant forfeits his confrontation right if his own wrongful conduct prevented any cross-examination of the declarant. *Giles* clarified that the forfeiture by wrongdoing

11

exception only applies upon a showing that the defendant acted with the specific intent to prevent the declarant from testifying, meaning "the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." 554 U.S. at 367 (citations omitted). The decision affirmed the historical understanding that where "the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded . . . ." *Id.* at 361.

As a threshold matter, Respondent argues that Jensen is not entitled to the benefit of the holding in *Giles* because it was not "clearly established Federal law" when the last state court considered Jensen's confrontation claim on the merits. Under 28 U.S.C. § 2254(d)(1), habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." *See Greene v. Fisher*, 132 S. Ct. 38, 44–45 (2011). Respondent contends that under *Greene*, "clearly established Federal law" is assessed at the time of the last state court adjudication on the merits of the claim, rather than at the time the defendant's conviction becomes final. *Id.* at 42 (holding that "clearly established Federal law" does not include decisions of the Supreme Court "that are announced after the last adjudication of the merits in state court but before the defendant's conviction becomes final").

More specifically, Respondent's view is that the last state court decision to address the merits of Jensen's confrontation claim was the trial court's forfeiture ruling in 2007 on remand from the Wisconsin Supreme Court. Because *Giles* was decided in 2008, four months after Jensen's conviction, its narrow forfeiture by wrongdoing exception was not clearly established at the time

12

of the trial court's decision. Although *Giles* was binding precedent when the Wisconsin Court of Appeals denied relief in 2010, Respondent argues that court declined to consider the confrontation claim on the merits, instead assuming that the testimonial statements were unconstitutionally admitted into evidence but finding any error harmless. Thus, in Respondent's view, *Giles* does not apply.

Respondent is mistaken. Respondent's mistake is in viewing the Wisconsin Court of Appeals' harmless error determination as separate and apart from its decision on the Sixth Amendment claim. The court of appeals expressly addressed the merits of Jensen's Sixth Amendment claim by assuming a violation occurred and finding it harmless. It therefore affirmed his conviction. This constitutes a decision on the merits of the claim. It also follows that the court of appeals' decision is the relevant decision for § 2254 review. The relevant decision is "the last reasoned opinion on the claim." *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). The court of appeals plainly delivered a reasoned opinion on Jensen's confrontation claim. Respondent's contention that this court should ignore *Giles* and instead consider the trial court's forfeiture finding as the last decision on the merits is simply wrong. *Giles* most certainly applies. "Clearly established federal law" within the meaning of § 2254(d) includes Supreme Court decisions announced prior to the initial direct appeal of a defendant's conviction. State courts cannot avoid federal habeas review by declining to decide issues that are presented to them.

The fact that the Wisconsin Court of Appeals simply assumed Jensen's Sixth Amendment rights were violated and did not actually decide the issue does affect this court's standard of review on that issue, however. As Jensen notes, where the state court does not reach a federal

13

constitutional issue that was fairly presented to it, a federal habeas court reviews the claim *de novo*, rather than under § 2254(d)(1). *Cone v. Bell*, 556 U.S. 449, 472 (2009); *see also Wooley*, 702 F.3d at 402 ("Because the Illinois Appellate Court did not reach Strickland's ineffectiveness prong, we apply *Wiggins* [*v. Smith*, 539 U.S. 510 (2003)] to review the issue de novo."). Here, it appears that there was no dispute after *Giles* that the admission of Julie's letter and statements to Kosman, based solely on the trial court's pretrial determination that Jensen had killed her, violated Jensen's Sixth Amendment rights. The State did not even argue to the contrary. Instead, the State argued that *Giles* left open the possibility that Julie's testimonial statements could still be admissible upon a finding that Jensen had killed her in order "to prevent her testimony in a family court action." *Jensen II*, 2011 WI App 3, at ¶ 33. It was this issue—"whether *Giles* should be read to permit testimonial evidence when the state can establish by a preponderance of the evidence that the defendant sought to prevent the victim from testifying in any court proceeding," *id.* at ¶ 34—that the Wisconsin Court of Appeals declined to address, choosing instead to "assume that the disputed testimonial evidence was erroneously admitted." *Id.* at ¶ 35. Respondent now asks this court to decide the same issue that the Wisconsin Court of Appeals left "for another day." *Id.* at ¶ 34.

Respondent argues that, even under *Giles*, Julie Jensen's letter and other testimonial statements to Officer Kosman would be admissible because a preponderance of the evidence establishes that one reason Jensen killed Julie was to prevent her testimony in a divorce or child custody action. Respondent points out that the prosecution pursued this theory from an early stage through closing arguments. (Resp't Br. in Opp'n 9, ECF No. 57.) In Respondent's view, logic dictates that it is more likely than not that "Jensen's intent in killing Julie was to prevent her from

14

using the legal system." (*Id.*) Respondent therefore asks this Court to conduct a *de novo* review of the record and make such a determination. (*Id.* at 13.)

Respondent's argument fails both procedurally and on its merits. It fails procedurally because a federal court reviewing a state conviction under § 2254 cannot modify or alter a state court's decision. In essence, Respondent is asking this court to make the findings of fact needed to preserve an evidentiary ruling made by the trial court on a ground that played no role in the trial court's ruling. The court has no authority to do so. Under § 2254, a federal court is authorized to review a decision a state court made; it may not review decisions the state court did not make or render new decisions that otherwise justify the state court's rulings. *See Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials."). If, as a general matter, there are other grounds that can constitutionally support a state court's ruling that, as rendered, is contrary to clearly established federal law, the state may seek the same ruling on the alternative grounds at a new trial in state court. The principles of federalism and comity that are so much a part of habeas jurisprudence counsel against the greater federal involvement in state criminal proceedings that would be required were this court to accede to Respondent's request. *Engle v. Isaac*, 456 U.S. 107, 126–28 (1982).

To the extent the issue is properly before the court, Respondent's argument also fails on its merits. *Giles* holds that the forfeiture exception to the Confrontation Clause requires that the defendant engaged in conduct that had the specific purpose of preventing the declarant from testifying. 554 U.S. at 361–62. Respondent notes that the prosecutor argued to the trial court that one reason Jensen killed Julie was "'to avoid any litigation surrounding a divorce or a custody dispute involving their two children.'" (Resp't Br. in Opp'n 9, ECF No. 57 (quoting State Trial Br.

15

Regarding Implications of *Crawford v. Washington* 13, ECF No. 45-12 ).) But the exception applies when the action taken by the defendant is intended to prevent testimony, not prevent litigation. One who kills a spouse to avoid a messy divorce is not acting to prevent the spouse from testifying, but to eliminate the need for the divorce altogether. If that is enough to invoke the forfeiture exception to the Confrontation Clause, then the exception would apply in any case in which the motive for the murder could arguably have been the subject of litigation. Read in this way, the exception would almost swallow the rule.

If Jensen caused Julie's death as the State alleged, he did so not to prevent her from testifying at a divorce but to eliminate any need for a divorce. The argument that Jensen killed his wife to prevent her from testifying in their divorce is essentially no different than the argument that he killed her to prevent her from testifying at her murder trial. In both cases, her unavailability to testify would be a result of the crime, not the motivation for it. This is, of course, exactly the motive the State advanced at trial. (State Trial Br. Regarding Implications of *Crawford v. Washington* 13, ECF No. 45-12 ("[The murder] was very carefully planned and calculated to get Julie Jensen out of the way so the defendant could pursue his relationship with Kelly LaBonte, maintain his relationship with his children and avoid the financial sacrifices associated with divorce in this marital property state.").) This is not the kind of specific intent that *Giles* requires in order to invoke the forfeiture by wrongdoing exception to a defendant's right of confrontation. Respondent's contention that Jensen murdered Julie to prevent her testimony during a divorce that neither person was actually pursuing or even planning to pursue when her death would necessarily obviate the need for the divorce is, therefore, fundamentally flawed.

16

Finally, as support for its argument that Julie's letter and testimonial statements are admissible even under *Giles*, Respondent relies most directly on *United States v. Lentz*, 524 F.3d 501 (4th Cir. 2008). (Resp't Br. in Opp'n 12, ECF No. 57.) However, *Lentz* is distinguishable because in that case the divorce proceedings were actually pending between the defendant and his ex-wife, the victim. The victim was never heard from again after she left to pick up her child at the defendant's home the night before a hearing was to occur in the divorce case to determine the amount of money the defendant was required to pay in child support payments, property division and toward the victim's attorneys fees. *Lentz*, 524 F.3d at 507–09. Here, by contrast, no divorce was pending, and there is no evidence one was even being contemplated. Finally, *Giles* was decided after *Lentz*, and thus *Lentz* does not address *Giles*' teaching on the forfeiture doctrine. For all of these reasons, *Lentz* is not persuasive.

The admission of Julie's letter and statements to Officer Kosman at trial based solely on the trial court's pretrial determination that Jensen killed her violated Jensen's Sixth Amendment right to confront the witnesses against him as the Supreme Court defined that right in *Crawford v. Washington*. The question remaining is whether the error was harmless.


### 2.    Harmless Error

On collateral review, a habeas court independently determines whether the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112, 119–20 (2007). Under *Brecht*, habeas relief must be granted if the constitutional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). As such, a habeas petitioner must establish

17

the trial error caused actual prejudice. *Id.* at 637. The *Brecht* standard is crafted to be a "less onerous harmless-error standard," from the standpoint of the state, in order to "promote[] the considerations underlying . . . habeas jurisprudence." *Id.* at 623; *see also Jones v. Basinger*, 635 F.3d 1030, 1052 n.8 (7th Cir. 2011) (citing *Fry*, 551 U.S. at 119–20) (explaining that because "any error sufficiently harmful to satisfy the *Brecht* 'actual prejudice' standard could be deemed harmless beyond a reasonable doubt only by unreasonably applying *Chapman*," formal application of both tests is not necessary). That is, it is harder for the petitioner to demonstrate actual prejudice under *Brecht* than it is for the petitioner to demonstrate that the state court unreasonably applied the "harmless beyond a reasonable doubt" standard in *Chapman v. California*, 386 U.S. 18 (1967). Thus, if the introduction of Julie Jensen's testimonial statements caused Jensen actual prejudice under *Brecht*, Jensen has necessarily demonstrated that the Wisconsin Court of Appeals unreasonably applied the *Chapman* test, without formal application of the AEDPA standard. *See id.* If a court considering a habeas petition "is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

A "host of factors" may be considered in conducting harmless error review, including the importance of the evidence to the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The court must "ponder[] all that happened without stripping the erroneous action from the whole" such that the "inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." *Kotteakos*, 328 U.S. at 764–65. Rather, in light of the entire record, the court will find an error harmless where "the error did not influence the jury, or had but slight effect" and where the

18

"judgment was not substantially swayed by the error." *Id.*; *see also Brecht*, 507 U.S. at 642 (Stevens, J., concurring) (emphasizing that the "habeas court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place"). However, the untainted evidence in a case can be so overwhelming that the tainted evidence can be considered insignificant by comparison and the error deemed harmless. *Schneble v. Florida*, 405 U.S. 427, 430 (1972) (finding an error harmless because "properly admitted evidence of guilt" was overwhelming compared to the "insignificant" prejudicial effect).

In this case, having reviewed the voluminous trial record, the court concludes that the erroneously admitted testimonial statements had a "substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 622. Although the prosecution presented a significant amount of properly admitted circumstantial evidence against Jensen, it was not so overwhelming that Julie Jensen's "voice from the grave" could be considered harmless*,* especially given the central role her testimonial statements played during the trial. Viewed in the context of the entire trial, the court concludes that Julie Jensen's letter and accusatory statements to Officer Kosman influenced the jury's decision or had a substantial effect on the outcome of the trial. The court reaches this conclusion for a number of reasons.

First, Julie Jensen's statements, especially the letter, played a key role from the outset of the trial. The prosecution framed its narrative of the case around the letter and Julie Jensen's predictions that her husband was trying to kill her. As Jensen argues, the State used the letter as a roadmap for trial, developing the themes Julie herself identified—she was caught in an unhappy marriage, Jensen was bitter about her affair, she would never take her own life because she loved her kids too much, Jensen was the only user of internet, and she feared he was plotting her murder. (Pet'r Br. in Supp.

19

Case 2:11-cv-00803-WCG   Filed 12/18/13   Page 19 of 33   Document 65

44, ECF No. 50.)  The letter was read during the State's opening statement.  (Jury Tr., Jan. 7, 2008, Ex. 8 at 9–10, ECF No. 25-9.)  Later, the defense addressed the letter in its opening.  (*Id.* at 64–65, 69, 93–94.)

After opening arguments, the prosecution returned to the letter repeatedly during trial, using Julie Jensen's own words to support other evidence.  The defense, in turn, attempted to counter the letter's weight.  Expert and non-expert witnesses testified on direct and cross-examination about the letter: the police  (Jury Tr., Jan. 24, 2008, Ex. 22A at 45–46, ECF No. 28-3; Jury Tr., Jan. 24, 2008, Ex. 22B at 143–44, ECF No. 28-4; Jury Tr., Jan. 30, 2008, Ex. 26B at 95, 97–99, 119, ECF No. 29-2; Jury Tr., Feb. 1, 2008, Ex. 28B at 112–19, ECF No. 29-5); the Wojts (Jury Tr., Jan. 17, 2008, Ex. 18A at 117–18, 124–25, ECF No. 27-5; Jury Tr., Jan. 17, 2008, Ex. 18B at 67–68, ECF No. 27-6; Jury. Tr., Jan. 19, 2008, Ex. 19A at 35–37, ECF No. 27-7); the prosecution's experts (Jury. Tr., Jan. 8, 2008, Ex. 11B at 39–47, ECF No. 26-2; Jury. Tr., Jan. 17, 2008, Ex. 18A at 40–41, ECF No. 27-5; Jury. Tr., Jan. 28, 2008, Ex. 24A at 26–29, ECF No. 28-7); and the defense's experts (Jury Tr., Feb. 12, 2008, Ex. 34A at 30, ECF No. 30-7; Jury Tr., Feb. 13, 2008, Ex. 35A at 145, 165–66, ECF No. 30-9; Jury Tr., Feb. 13, 2008, Ex. 35B at 12–19, 32–56 ECF No. 30-10).  The letter was again emphasized during both parties' closing arguments.  (Jury Tr., Feb. 18, 2008, Ex. 38A at 44, 100, 115, 131, ECF No. 31-5; Jury Tr., Feb. 18, 2008, Ex. 38B at 59–60, 62–65, 84, 129–132, ECF No. 31-6.)  In short, the letter consistently served as an important source of the prosecution's ability to argue its theory of the case, while undermining the defense's suicide theory, because Julie Jensen's unconfronted words established her version of the facts.

Second, the Wisconsin Court of Appeals ignored this central role Julie Jensen's testimonial statements played in the trial.  Instead, in finding any error harmless, the Wisconsin Court of

20

Appeals' decision focused almost exclusively on the "untainted and undisputed gripping evidence against Jensen," including the computer evidence, motive evidence, and the medical evidence supporting the State's homicide theory. *Jensen II*, 2011 WI App at ¶¶ 37–38. It set out the contents of Julie's letter sentence by sentence and identified evidence it construed as corroborating each allegation. *Id.* at ¶¶ 39–69. The court of appeals then conducted a similar, though less detailed, analysis of Julie's verbal statements to police. *Id.* at ¶¶ 71–72. Having found corroborating evidence for each sentence of the letter and each statement to Officer Kosman, it concluded "[t]he sine qua non is that the testimonial statements provided nothing significant beyond the properly admitted nontestimonial statements." *Id.* at ¶ 73.

The characterization of the "untainted and undisputed gripping evidence against Jensen" is somewhat misleading. *Id.* at ¶ 38. What the court of appeals did not acknowledge is that the undisputed evidence was entirely circumstantial and subject to more than one inference. The decision of the court of appeals demonstrated that the State's evidence was persuasive, but it did so largely by ignoring the contrary evidence and competing inferences drawn by the defense. In fact, the defense challenged much of the State's evidence and presented an alternative interpretation of much that it did not dispute. There was nothing close to a smoking gun, and even evidence the court of appeals characterized as the most incriminating evidence against Jensen—the computer evidence, including the internet searches for poisoning—was less than conclusive. There was no evidence that precluded the jury from finding that at least some of the internet searches had been conducted by Julie Jensen.

Moreover, although Jensen's ongoing extramarital affair served as strong evidence of motive for homicide, it could also provide a motive for Julie Jensen to commit suicide and to seek to harm

her husband in the process. In a case where virtually every piece of properly admitted evidence was contested and subject to competing inferences and interpretations, Julie Jensen's prediction that her husband was going to poison her and that she would "never take her own life" substantially influenced the jury's ultimate decision and dramatically colored their view of the rest of the evidence.

To be sure, the State presented weighty circumstantial evidence of Jensen's guilt without the letter, and a reasonable jury could perhaps reach the same verdict in a trial free of constitutional error. But this does not mean the error was harmless. *Kotteakos*, 328 U.S. at 776 ("That conviction would, or might probably, have resulted in properly conducted trial is not the criterion."). The focus of the harmless error analysis is not solely on the guilt of the defendant, but on the effect the error had on the jury's verdict. A reviewing court must consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993); *accord. Kotteakos*, 328 U.S. at 764 (explaining that courts must determine the impact of the error "on the minds of other men, not on one's own," an "important difference, but one not easy to ignore when the sense of guilt comes strongly from the record"). The Wisconsin Court of Appeals focused its harmless error analysis far too narrowly. *See Sullivan*, 508 U.S. at 279–80 ("The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.") (emphasis in original); *accord. Kotteakos*, 328 U.S. at 764 (finding the inquiry is "different, or may be, from guilt in fact . . . [a]nd the question is, not were [the jurors] right in their judgment, regardless of the error or its effect upon the verdict"); *Jones*, 635 F.3d at 1053 (explaining

22

a court does not "imagine[] what the record would have shown without [the erroneously admitted evidence] and ask[] whether the remaining evidence was legally sufficient to sustain a finding of guilt"); *State v. Stuart*, 2005 WI 47, ¶ 40, 279 Wis. 2d 659, 695 N.W.2d 259 ("An error is harmless if the beneficiary of the error proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (quoting *Chapman*, 386 U.S. at 24.)). To do otherwise would ignore "the significant prejudicial effect the error can have on a jury's ability to evaluate fairly the remaining evidence." *Jones*, 635 F.3d at 1053.

Third, the court of appeals' finding that the erroneously admitted testimonial evidence provided "nothing significant beyond the properly admitted nontestimonial statements" is contradicted by the history of this case. *Jensen II*, 2011 WI App at ¶ 73. This finding is belied by the fact that the parties engaged in a lengthy pretrial battle, (Cir. Ct. Order 4, Aug. 4, 2004, ECF No. 45-17), including an interlocutory appeal directly to the Wisconsin Supreme Court, in order to determine whether Julie's letter and statements would come in at trial. *See Jensen I*, 2007 WI at ¶¶ 1–2. After the Wisconsin Supreme Court's ruling, the prosecution then engaged in a ten-day forfeiture hearing in order to introduce Julie's statements. During this prolonged evidentiary battle, the prosecution referred to the admission of Julie's letter as a "make or break issue from the State's perspective." (Mot. Hr'g Tr. 3, June 2, 2004, ECF No. 45-21). The prosecution viewed Julie's testimonial statements, especially the letter, as "very damaging to [the defense]" and "an essential component of the State's case" because Julie's statements were a "cry out for help to law enforcement" and her effort to "warn a potential jury in the future that she was not suicidal, that she would never commit suicide, that she lived for her children." (*Id.* at 22–23.) For these reasons, the prosecution argued before the trial court that the letter was of "extraordinary value as to Julie

23

Jensen's state of mind which is the central issue in this case." (State's Reply to Def. Supp'l Mem. 18, ECF No. 45-11.) In light of this history, Respondent's argument to this court that the letter or her statements to Officer Kosman were, in effect, mere surplusage is incredible.

Moreover, erroneously admitted evidence may bolster and corroborate other evidence such that it is not simply cumulative under the circumstances of the case. *See*, *e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 299 (1991) (finding an erroneously admitted confession was not merely cumulative of another because "the jury might have believed that the two confessions reinforced and corroborated each other"). Just because two items of evidence might tend to prove the same fact does not mean the jury placed equal emphasis on each. For example, as Jensen argues, the letter was powerful and "had a greater aura of reliability than the statements to other witnesses because it was made to police and memorialized in writing." (Pet'r Br. in Supp. 44, ECF No. 50.) By their very nature, testimonial statements are "a solemn declaration or affirmation made for the purpose of establishing or proving some fact" and thus, an "accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. And although witnesses testified that Julie Jensen had told them similar things, their testimony was subject to attack in ways the letter was not. This is, of course, exactly the point of the "crucible of cross-examination." *Id.* at 61. Viewed alongside the letter, however, Julie's unconfronted words served to reinforce and corroborate their testimony.

The admission of Julie Jensen's accusations infected the trial in other ways. For instance, it critically shifted the defense's strategy and presentation of its case. The prosecution argued as much in its closing argument, stating Jensen was "stuck with a story that Julie Jensen committed

suicide and framed her husband for murder. He [sic] wouldn't be his favorite story, it wouldn't be his first choice." (Jury Tr., Feb. 18, 2008, Ex. 38A at 100, ECF No. 31-5.) The State also argued:

> But the defense in this case is far more than just that Julie Jensen committed suicide. The defense is that Julie Jensen was a virulently angry, resentful, bitter woman who not only took her own life, but tried, plotted to destroy her husband's life.
>
> In other words, not just that she committed suicide, but that in the process she framed her husband for murder, thereby assuring that her two children would be left without a mother and without a father.

(*Id.* at 48.) Had the testimonial statements not been admitted, Jensen may have argued that Julie Jensen simply committed suicide—not that she committed suicide and deliberately framed her husband for her murder. The availability of this argument to the prosecution is one reason that the letter was "an essential component" (Mot. Hr'g Tr. 21–22, June 2, 2004, ECF No. 45-21) and "of extraordinary value." (State's Reply to Def. Supplemental Mem. 18, ECF No. 45-11.)

Fourth, aside from the failure to properly consider the significance of Julie's testimonial statements, the harmless error analysis suffered from another major flaw. One of the factors to consider in any harmless error analysis, including *Brecht* and *Chapman*, is the presence of contradictory evidence. *E.g.*, *Jones*, 635 F.3d at 1052 (applying *Brecht*); *Stuart*, 2005 WI at ¶ 41 (applying *Chapman*). Here, although the court of appeals conducted an extensive examination of what it considered duplicative/corroborative evidence in the record supporting the conviction, it failed to discuss any of the evidence that supported Jensen's defense. *Jensen II*, 2011 WI App at ¶¶ 25–73. A reader of the court of appeals' opinion would conclude that Jensen called no witnesses, introduced no evidence, never questioned the credibility of any witness, and never even elicited helpful testimony from a prosecution witness. *See id.* This is far from an accurate account of the trial.

For example, viewed in isolation, the State's computer evidence against Jensen was quite convincing. But that was not the only evidence the jury heard about the computer. The jury also heard Jensen's statement to one of the investigators in which he denied any knowledge of the searches for poison and claimed that Julie also used the computer and accessed the internet, information that was confirmed by one of Julie's friends. (Interview of Mark Jensen Tr. 10–12, Apr. 21, 1998, Trial Ex. 142, ECF No. 46-83; Jury. Tr., Feb. 11, 2008, Ex. 33A at 106–09, ECF No. 30-5.) Jensen told the investigator that the computer was not password protected and that Julie entered information on a financial program called Quicken and was interested in medical information. (Interview of Mark Jensen Tr. 11–12, Apr. 21, 1998, Trial Ex. 142, ECF No. 46-83.) The defense also challenged the State's portrayal of Julie as timid, unsophisticated, and totally dependent on Jensen, introducing evidence that Julie studied nursing at the University of Wisconsin at Oshkosh and took courses in subjects such as chemistry, pharmacology, bacteriology, and genetics. (Julie Jensen UW-Oshkosh Tr. 1, Trial Ex. 289, ECF No. 49-32; Jury Tr., Feb. 8, 2008, Ex. 32B at 90–94, 103–04, ECF No. 30-4.) She later obtained a Series Seven brokers license that allowed her to place and accept stock trades. (*Id.* at 102–03.) The defense pointed out evidence in the internet history of a search for "suicide" on November 10, 2008, which was also the first day on which the word ethylene glycol appears in the internet history. (Jury Tr., Feb. 8, 2008, Ex. 32A at 36–38, ECF No. 30-3.) And while it appears true that more incriminating sites were accessed when Jensen (as well as Julie) was home, the defense argues from Ms. Wojt's testimony at one of the pretrial hearings that a December 2, 1998 computer search for ethylene glycol was made after he had left the home that day to see Dr. Borman. (Pet.'s Reply Br. in Supp. 21, ECF No. 61 (citing Jury Tr., Jan. 11, 2008, Ex. 14A at 65, ECF No. 26-7; Jury Tr., Jan. 18, 2008, Ex. 19A at 31, ECF No. 27-7).) Jensen also

26

points to the testimony of his own medical experts as support for the fact that the amount of ethylene glycol found in Julie would not have rendered her incapable of deleting internet history, and argues that the deletion of internet history is as consistent with Julie trying to hide evidence of her suicide as it is with his hiding evidence of murder.

Other evidence offered by the prosecution was likewise challenged, perhaps none more so than the precise cause of death. The State initially claimed, relying on the March 11, 2002 report of Dr. Christopher Long of the St. Louis University Health Sciences Center, that Julie had died of ethylene glycol poisoning, and that the evidence showed that she had ingested the poison on at least two occasions, with the last occurring within hours of her death. (Letter from Dr. Christopher Long 2–3, Mar. 11, 2002, Trial Ex. 121, ECF No 46-74.) Dr. Long explained that ethylene glycol initially affects a person like alcohol when consumed. (*Id.* at 1.) During the first phase, which can occur between thirty minutes and twelve hours post ingestion, the person may appear intoxicated, but without the smell of alcohol. (*Id.*) The products of the ethylene glycol's metabolism become more toxic at each step. During the second phase, which begins 12 to 14 hours after ingestion, oxalate crystals may be present and tachycardia, hypotension, pulmonary edema and congestive heart failure can result. (*Id.* at 1–2.) Dr. Long concluded from the fact that there were crystals in her kidneys and "large amounts" of ethylene glycol in her stomach contents, that Julie did not die from a single dose of the poison. (*Id.* at 2.) The presence of crystals in her kidneys, as well as reports of her condition the day before her death, Dr. Long concluded, demonstrated that she had survived an initial dose that she had ingested more then 12 hours before her death. (*Id.*) The "large concentration" of ethylene glycol in her stomach, in Dr. Long's opinion, indicated "an acute ingestion at or near the time of death." (*Id.*) Dr. Long found this fact particularly significant:

27

The final administration of ethylene glycol didn't have time for absorption before her death. It is not reasonable that Ms. Jensen could have consumed any ethylene glycol in her condition (by herself) and then cleans up (hides) the source of the ethylene glycol afterwards. Her death was very close to the last administration of ethylene glycol.

(*Id.* at 3.) Based on the autopsy, the fact that there was no ethylene glycol found in the house, and Julie's letter and reports to the police, Dr. Long concluded that Julie's death was not a suicide. (*Id.*) Eight days later, the State charged Jensen with her murder.

Even before trial, however, defense experts had uncovered a serious flaw in Dr. Long's analysis. Instead of "large amounts" or "a large concentration" of ethylene glycol in Julie's stomach, the actual amount was 3940 micrograms, or a half teaspoon, out of 660 milliliters, or 22 ounces, of stomach contents. (Jury Tr., Feb. 13, 2008, Ex. 35A at 140-42, ECF No. 30-9.) According to Dr. J. Scott Denton, a forensic pathologist and deputy medical examiner for Cook County, Illinois, and Dr. Barry H. Rumack, a medical toxicologist, this amount of ethylene glycol in her stomach contents was entirely consistent with Julie having ingested a lethal dose of the poison 24 to 48 hours before her death. (Letter from Dr. J. Scott Denton 1–2, 5–6, May 7, 2004, Trial Ex. 310, Ex. 49-43; Letter from Dr. Barry H. Rumack 1–3, May 7, 2004, Trial Ex. 279, ECF No. 49-1.) Dr. Rumack further noted that it was "extremely difficult to administer any significant quantity of commercial automobile antifreeze, the most commonly available source of ethylene glycol, to an individual without their knowledge." (*Id.* at 2.) Both experts concluded from their review of the case that the likely cause of death was suicide.

By the time of trial, the State was advancing yet another theory of how Julie had died—Jensen had suffocated her. This new theory was based largely on the testimony of Aaron Dillard, a jailhouse informant with seven prior convictions who even the prosecutor conceded was

"a liar and a con man and a thief." (Jury Tr., Feb. 18, 2008, Ex. 38B at 229, ECF No. 31-6.) Dillard testified that while in jail awaiting sentencing for his own crimes, he had many conversations with Jensen, who had been placed in custody when his bond was increased after the forfeiture hearing. Dillard claimed that Jensen eventually admitted to him that he had in fact killed his wife. According to Dillard, Jensen admitted that he had tried to poison Julie with antifreeze but later suffocated her by pushing her face into her pillow when it appeared she might be recovering. (Jury Tr., Jan. 18, 2008, Ex. 19A 116-20, ECF No. 27-7.) In return for his testimony, Dillard received a recommendation from the prosecutor for early release from prison. (*Id.* at 65.) Jensen reasonably argues that the State's initial missteps in determining the cause of Julie's death, its introduction of this new theory based on the testimony of such an unsavory witness, and the willingness of its experts to embrace it did considerable damage to the credibility of the State's theory. This difficulty with the State's case was not mentioned by the Wisconsin Court of Appeals in its harmless error analysis.

Other problems went unmentioned as well. For example, the court of appeals recounted in its decision the testimony of Edward Klug, one of Jensen's co-workers who attended a national sales convention a month before Julie's death. Klug testified that during a late-night conversation when they were complaining about their spouses, Jensen told him that there were web sites with instructions on how to poison your wife with antifreeze. According to Klug, Jensen said that "giving doses of Benadryl and antifreeze 'over a long period of time' is 'relatively undetectable' and will start 'crystallizing you from the inside out.'" *Jensen* II, 2011 WI App 3 at ¶37. Klug described the conversation not as an abstract discussion, "but rather that Jensen 'was telling me that he was going to be doing that.'" *Id.* The court omitted from its discussion of Klug's testimony, however, the fact

29

that Klug did not report this discussion to the police until almost nine years after Julie's death, even though he worked with Jensen and had talked with the district attorney's office in 2002. In fact, Klug had offered Jensen condolences when he first heard of Julie's death. (Jury Tr., Jan. 8, 2008, Ex. 11B at 111, ECF No 26-2.) The defense also offered evidence that Klug's account was contradicted by other witnesses, that he was viewed by other colleagues as an attention seeker and that he had a reputation for dishonesty, none of which was mentioned by the court of appeals.

The court also ignored defense evidence concerning Julie's mental health. For example, the court considered Dr. Borman's testimony that Julie "alluded to an affair" as "corroborative" of two sentences of Julie's letter regarding the deterioration of the marriage. *Id.* at ¶¶ 48–49. But it ignored Dr. Borman's testimony that she was "depressed and distraught and almost frantic, actually." (Jury Tr., Feb. 11. 2008, Ex. 33A at 35, ECF No. 30-5.) In fact, the opinion never mentioned any of the evidence presented by the defense regarding Julie's depression or her troubled family history. (*Id.* at 33–34; Jury. Tr., Feb. 8, 2008, Ex. 32A at 99, 101–05, ECF No. 30-3.) The defense introduced evidence of a "psychological autopsy" conducted by Dr. Herzl Spiro, a forensic psychiatrist who reviewed Julie's medical and mental health records and conducted interviews with her physician, pastor, husband, friends, and family in an effort to assess her risk of suicide. (Jury Tr., Feb. 12, 2008, Ex. 34A at 12–17, ECF No. 30-7; Psychiatric Case Study, May 26, 2004, Trial Ex. 300, ECF No. 49-37.) Dr. Spiro was permitted to testify that Julie was suffering from a major depressive disorder that was complicated by anxiety and agitation with possible delusional features. (Jury Tr., Feb. 12, 2008, Ex. 34A at 47, 51–52, 69–70, ECF No. 30-7.) Dr. Spiro testified that based on this diagnosis and because of other factors, including marital problems, employment issues and family history, Julie posed a heightened risk of suicide. (*Id.* at 58–70.) Based on his "psychological

30

autopsy," Dr. Spiro testified that Julie's ingestion of ethylene glycol was "more likely the product of suicidal intent than it is from accidental ingestion or homicide." (*Id.* at 74.)

Finally, the court ignored other facts that supported the defense's suicide theory, such as Julie's fifteen minute telephone conversation with Mrs. Wojt the day before Julie died in which she told Mrs. Wojt not to worry if she did not see Julie outside that day because Julie was not feeling well due to her medication (Jury Tr., Jan. 18, 2008, Ex. 19A at 15–16, 32–34, ECF No. 27-7), the conversation with her sister-in-law a few days earlier that she would be ill on Wednesday, December 2, 1998, because she expected to be put on medication by her doctor (Jury Tr., Feb. 11, 2008, Ex. 33A at 137–38, ECF No. 30-5; Jury Tr., Feb. 11, 2008, Ex. 33B at 1–2, ECF No. 30-6), and Julie's refusals of help from the Wojts and Officer Kosman. (Jury. Tr., Jan. 17, 2008, Ex. 18A at 118–20, 124, ECF No. 27-5; Jury. Tr., Jan. 18, 2008, Ex. 19A at 34–35, ECF No. 27-7; Jury. Tr., Jan 24, 2008, Ex. 22A at 47–48, ECF No. 28-3; Jury. Tr., Jan. 24, 2008, Ex. 22B at 13–15, ECF No. 28-4.) While it is possible that a jury would have convicted Jensen based on the case presented by the State despite the testimony and facts that supported his defense, the court of appeals' conclusion that the constitutional errors in this case were harmless beyond a reasonable doubt is based on a one-sided recounting of the evidence that omits the entire case presented by Jensen.

In sum, Julie's letter from the grave served as an unrebuttable and emotionally compelling accusation of guilt. As noted, the statement reflected Julie's state of mind and her opinion about conduct that Jensen might undertake in the future. It provided key and emotionally compelling facts allowing the jury, in a close case where it deliberated for more than thirty hours, to make inferences about a possible motive and premeditation, as well as exonerating Julie in the process. As another federal court has explained: "[t]he statement presented all the classic hearsay dangers and abuses.

Here was that voice from the grave casting an incriminating shadow on the defendant. . . . The damaging evidence stands impregnable—irretrievably lodged in the jurors' minds." *United States v. Brown*, 490 F.2d 758, 781 (D.C. Cir. 1973). Or, as Justice Cardozo eloquently put it, "[t]he reverberating clang of those accusatory words would drown all weaker sounds." *Shepard v. United States*, 290 U.S. 96, 104 (1933) (decedent's statement to nurse that her husband poisoned her was not admissible as a dying declaration or upon other grounds). Only by ignoring the impact of such evidence, as well as the contrary evidence offered and inferences drawn by the defense can it be said that the error in admitting it was harmless. To say that the letter was not a key piece of evidence and to downplay its effect on trial is to create a sterilized, post-hoc rationalization for upholding the result. The erroneous admission of the evidence was prejudicial to Jensen, and therefore, it cannot be deemed harmless.

## CONCLUSION

For the reasons set forth above, the Court concludes that Jensen's rights under the Confrontation Clause of the Sixth Amendment were violated when the trial court admitted Julie Jensen's letter and testimonial statements to police at his trial and that the errors were not harmless. The decision of the Wisconsin Court of Appeals to the contrary constitutes an unreasonable application of clearly established federal law. It thus follows that Jensen's petition for relief under 28 U.S.C. § 2254 should be granted. Because the Court finds that the admission of Julie Jensen's testimonial statements in violation of the Confrontation Clause was not harmless error, it is not necessary to address Jensen's due process argument.

32

Jensen is therefore ordered released from custody unless, within 90 days of the date of this decision, the State initiates proceedings to retry him. The Clerk is directed to enter judgment accordingly. In the event Respondent elects to appeal, the judgment will be stayed pending disposition of the appeal. Finally, Respondent's motion to file a supplemental brief (ECF No. 64) is denied.

**SO ORDERED** this __18th__ day of December, 2013.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court